# Exhibit A

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| SUZANNAH ANDERSON, JACOB ASHKAR, ELENA BERRY, BART BERRY, GWINT L. FISHER, RENÉE FISHER, IRIS RUIZ, GARET CUNNINGHAM, ROSALBA RUIZ, SUZANNAH ANDERSON, CADEN ASHKAR, KENDRA FROME, JACOB FROME, HAZEL FROME, AND OLIVIA FROME, individually and on behalf of all others similarly situated, and DOES 1-327; | NO.  24-2-00824-1 KNT **FIRST AMENDED COMPLAINT FOR DAMAGES AND CLASS RELIEF** |
| Plaintiffs, | |
| v. | |
| THE BOEING COMPANY, a Delaware profit corporation; and ALASKA AIRLINES, INC., an Alaska corporation, | |
| Defendants. | |

Plaintiffs allege:

## I.      THE INCIDENT

1.1      <u>Alaska Airlines Flight 1282</u>. On January 5, 2024, Alaska Airlines Flight 1282, operating a Boeing 737-MAX 9 / B39M aircraft, serial number 67501, registration N704AL ("Subject Aircraft") departed on a regularly scheduled domestic flight from Portland, Oregon, bound for Ontario, California. As that aircraft was climbing, it lost its left-side door "plug" in flight. The aircraft depressurized, which terrified its passengers, and was forced to return to Portland International Airport to make an emergency landing.  The Boeing Company's CEO Dave

Calhoun calls the defect that led to this lived nightmare "our mistake"[1] and publicly admitted, by his implication, that the plug was not properly secured to the fuselage either during manufacture or otherwise while the aircraft was being built by Boeing, and/or its subcontractor, Spirit AeroSystems.[2] He told CNBC, "It escaped their factory but then it escaped ours too."

1.2 <u>Seat layout</u>.  The interior seating layout of the Alaska Airlines Boeing 737-9 MAX aircraft is represented below.  The left plug is located at row 26.



1.3 <u>Souls aboard</u>.  On January 5, 2024, the reported 171 passengers and six crew aboard Alaska Airlines Flight 1282 had been experiencing a normal flight. About ten minutes after takeoff, with a sudden loud explosive noise, the left door plug detached and shot off of the Subject Aircraft, which suddenly and violently depressurized.

1.4 <u>Immediate effects</u>. The force of the depressurization ripped the shirt off a boy, and sucked cell phones, other debris, and much of the oxygen out of the aircraft. The entire seatback of 26A as well as the headrests in seats 26A and 26B, next to the blown-out hole in the fuselage, were torn off and expelled into the night. Paneling and window trim in several rows extending from the point of failure was damaged.  The shirtless boy leapt over the woman next to him, and escaped toward the front of the plane. At least two others seated near the hole followed and found new seats closer to the front.

---

[1] *See, e.g.*, https://www.cbsnews.com/news/boeing-ceo-acknowledging-our-mistake-alaska-airlines-door-plug-blowout-dave-calhoun/.
[2] *See, e.g.*, https://www.youtube.com/watch?v=7PngZBdCwJU.

FIRST AMENDED COMPLAINT FOR DAMAGES - 2

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19       1.5   <u>Injuries</u>.   The event physically injured some passengers and emotionally

20   traumatized most if not all aboard.  The violence of the event bruised the bodies of some. The

21   cockpit door blew open and a flight attendant rushed to try to close it. The pressure change made

22   ears bleed and combined with low oxygen, loud wind noise and traumatic stress made heads ache

23
24

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

severely. Passengers were shocked and confused, thrust into a waking nightmare unsure if these were their last seconds alive.

     1.6    <u>Oxygen masks</u>.  As depicted in the photo below,[3] the oxygen masks dropped from the ceiling,



But many of the oxygen masks did not seem to work: For at least some passengers, despite tugging on the tubes, no oxygen flowed.  Flight attendants sought to attend to children, questions and concerns, and carried oxygen bottles to some, but did not or could not help all those whose oxygen masks were not functioning.

---

[3] Photo copied from The Washington Post, attributed to Flight 1282 passenger Nicholas Hoch, available at https://www.washingtonpost.com/travel/2024/01/10/alaska-airlines-boeing-max-9-passenger-compensation/

FIRST AMENDED COMPLAINT FOR DAMAGES - 4

1       **1.7**   <u>Chaos and panic</u>.  According to the NTSB, the wind noise caused by the gaping

2 hole in the fuselage and the ensuing chaos seriously impaired flight crew communications among

3 themselves and with Air Traffic Control.  A man stood and reportedly shouted, "*There's a fuckin'*

4 *hole inside the plane! What the fuck is that?!*"[4] A woman reportedly shouted, "*Oh my God!*

5 *Someone's shirt was sucked out of the plane! There's a hole in the plane!*"[5]

6       **1.8**   <u>Diversion</u>.  The pilots declared an emergency and diverted. They descended under

7 10,000 feet MSL, and turned the airliner back toward Portland.

8       **1.9**   <u>Terror aloft</u>.  As the airliner flew on, passengers feared they would not survive the

9 flight. Thoughts of a complete plane malfunction and possible destruction naturally entered their

10 minds. Some prayed. Some texted family to express their trepidation.  Some gripped and clung to

11 one another.  Some adult passengers were crying. Most were eerily subdued in their collective

12 helpless state, muted with masks on.

13       **1.10**   <u>Landing</u>. Fortunately, the flight crew was able to land the aircraft safely.

14       **1.11**   <u>On the ground</u>.  After the plane taxied to a gate, emergency responders boarded and

15 asked whether anyone was injured.  The passengers who had been nearest the door plug hole

16 deplaned first, followed by the rest.

---

[4] https://www.cnn.com/2024/01/06/us/passengers-alaska-airlines/index.html
[5] https://www.oregonlive.com/portland/2024/01/are-we-going-down-passengers-on-alaska-airlines-flight-1282-describe-fear-confusion.html

FIRST AMENDED COMPLAINT FOR DAMAGES - 5



1.12    Exchanges of information.  Inside the airport terminal building, passengers talked to one another; sharing questions, concerns, observations, feelings, and speculation. Some shared photos and/or video and audio they had taken while aloft of passengers, of where the hole where the Subject Aircraft's left plug had been and of related damage and debris.

1.13    Where to now?  Some passengers were rebooked on a new flight aboard a substitute Alaska Airlines 737-MAX 9 and continued to Ontario, California. Many understandably had no interest in reboarding an aircraft and instead took ground transportation to their homes in the area or found other accommodation.

1.14    Terror on the ground.  The information passengers obtained upon landing, such as seeing the gaping hole and damage to the aircraft, and communications from airline employees, other passengers, and news reports, led many to suffer further injurious impacts of their in-flight experience on their psychological states.

FIRST AMENDED COMPLAINT FOR DAMAGES - 6

## II.      THE AIRCRAFT

2.1      Manufacturer.  Defendant The Boeing Company is the manufacturer of the Subject Aircraft within the meaning of the Washington Product Liability Act, Chapter 7.72 RCW because Boeing designed, made, fabricated, constructed, and/or remanufactured, and/or had the contractual and/or designated responsibility to design, make, fabricate, construct and/or remanufacture, and/or marketed or branded under its name, some or all of the Subject Aircraft, including but not limited to its left plug door assembly.  Boeing conducted final assembly and inspection of the Subject Aircraft, in Renton, Washington. The Boeing Company is the type certificate holder for the aircraft. As such, under Washington law and under the Federal Aviation Regulations, Boeing is responsible for the safety of design and maintenance instructions as well as continuing airworthiness of the aircraft.

2.2      Certifications.   The Subject Aircraft received its airworthiness certificate on October 25, 2023, entered service with Alaska Airlines in the state of Washington on October 31, 2023, and received its FAA registration certificate on November 2, 2023.

2.3      Registered Owner.  On information and belief formed after reasonable inquiry and subject to further investigation and discovery, Alaska Airlines, Inc. upon its purchase of the Subject Aircraft and all times thereafter relevant to this action, was the registered owner of the Subject Aircraft.

2.4      Delivery.  On information and belief formed after reasonable inquiry and subject to further investigation and discovery, Alaska Airlines, Inc. took delivery from The Boeing Company of the Subject Aircraft on or about November 11, 2023 in the state of Washington.

2.5      Plug.   The door plug on the left side of the Subject Aircraft relies on four bolts to ensure a proper seal between the door edges and the fuselage is maintained in flight, and to prevent

FIRST AMENDED COMPLAINT FOR DAMAGES - 7

1  vertical translation of the door in flight. This is achieved through bolts attached through upper

2  guide fittings and lower hinge pins, as illustrated below[6]:



18  2.6  <u>Missing and/or defective bolts</u>.  On information and belief formed after reasonable

19  inquiry, and subject to further investigation and discovery, The Boeing Company delivered the

20  subject 737-MAX 9 to Alaska Airlines, Inc. without properly securing the plug to the airframe,

21  and/or one or more of the bolts and/or seals required by design to secure the door was or were

22  defective in their material and/or form at the time the aircraft was manufactured and delivered to

23

[6] Illustration published in Barron's (1/11/2024), available at https://www.barrons.com/news/boeing-737-9-door-plug-218747a7.

24

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

the purchaser. On information and belief subject to further investigation and discovery,   Boeing mechanics found six loose bolts on the roller guide plates in the door frame of the Subject Aircraft during its assembly around the right side door plug (not the left one that blew out aloft), and had tightened them.[7] The NTSB has found that the guide roller tracks at the missing left door plug were fractured.[8]

2.7     <u>More loose bolts</u>. Federally mandated inspections after January 5, 2024, of Boeing 737-MAX 9 aircraft owned and operated by Alaska Airlines and United Airlines, in response to the incident that gives rise to this Complaint, have found numerous loose bolts, which suggest that The Boeing Company has failed to design and/or construct those aircraft safely.

2.8     <u>Pressure System Alarms</u>.  The Subject Aircraft had three in-flight pressure system alarms before January 5, 2024, which resulted in Alaska Airlines withdrawing the aircraft from long-range service over water, so that if a pressurization problem were to occur, the aircraft could rapidly return to an airport.

### III.     <u>QUALITY KILLERS</u>

3.1     <u>Profit culture.</u> As reported by Dominic Gates in the Seattle Times on January 15, 2024, aviation analyst Richard Aboulafia, of AeroDynamic Advisory describes how Boeing adopted a focus on cost-cutting and financial metrics.

> Aboulafia placed blame firmly on CEO Calhoun and Boeing's longtime focus on cost cutting and financial metrics.

> In particular he cited the strategy Boeing euphemistically dubbed "Partnership for Success" that former CEO Jim McNerney pushed: squeezing suppliers with ever lower pricing for their parts.

> That led Spirit in particular into a spiral of losing money in making parts for Boeing.

---

[7] https://theaircurrent.com/aviation-safety/undamaged-plug-exit-on-alaska-max-9-had-fasteners-tightened-during-assembly/
[8] *Id.*

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

In June, Spirit was $3.7 billion in debt. Its cumulative losses on the 787 Dreamliner program alone amounted to a colossal $1.4 billion, or about $1 million per airplane.

"The idea of demanding more for less endlessly and leaving it to suppliers to worry how they're going to stay alive, that was just not a viable formula," Aboulafia said.

By October, the financial distress came to a head, and after Shanahan came in Boeing finally was persuaded to recognize it must pay Spirit more to save it.

It agreed to give Spirit better pricing, with one provision having Boeing pump in an additional $455 million over the next two years to build 440 Dreamliners — about $1 million per airplane.

Aboulafia said unless Boeing returns its focus to engineering and manufacturing, further quality problems will inevitably follow.

"It's gonna keep happening until they change their culture," he said. "And that change is not coming from the top."

"The message from Calhoun and company has been we'll turn on the free cash flow again, investors will be happy. That's it," Aboulafia said.[9]

3.2   <u>Rushed production</u>.  On information and belief subject to further investigation and discovery: Production schedule, not safety quality, is "king" at Boeing, and this has not changed since the MAX 8 disasters in Indonsesia and Ethiopia.  Since those crashes, Boeing has had over 20 reports of production problems come to light, and multiple requests by Boeing to the FAA for engineering exemptions.  Factory workers sometimes have to "chase the plane" down the production line in order to complete their work if they are not prepared with parts or otherwise to work on it at the time it passes them initially; then they have to go backwards down the line to catch up.

3.3   <u>Quality inspectors</u>.  In aviation manufacturing, traditionally quality inspectors have acted as a "second set of eyes" to ensure that work is correctly done. For example, they check that the torque on a nut is correct, that the bolt and hole are the proper size, that safety wires to prevent the bolt from backing out is correct.  These checks are to be recorded as part of the FAA's

---

[9]

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1    regulatory oversight system. But the FAA has found that in some instances, Boeing managers have

2    pressured quality inspectors to issue final acceptances without documentation of defect repairs.

3    Those defects may not go away, and may not be documented.

4        3.4    <u>Reduction of quality inspectors</u>.    Boeing has worked hard, fighting union

5    opposition and FAA skepticism, to eliminate quality inspections in favor of the fantasy that

6    humans are not human, such that everything will be done right the first time. Since the fatal MAX

7    8 crashes, thousands of quality control inspections have been removed. Boeing has moved to

8    quality checking samples of parts, not every part. Instead of relying on humans, Boeing has been

9    increasingly relying on electronic tools to do some of the quality checking, and instead of marking

10   checked nuts on the nut where a worker or inspector can see it, recording the checks electronically.

11   Boeing's delegation of 737 fuselage construction to subcontractors long preceded the construction

12   of the Subject Aircraft.  On information and belief formed after reasonable inquiry and subject to

13   further investigation and discovery, Boeing and its subcontractors involved in construction of the

14   Subject Aircraft's fuselage including but not limited to its door plug assemblies, in order to

15   increase profit, did not use dedicated quality control inspectors, but rather mandated that workers

16   would inspect their own work.

17       3.5    <u>Alaska Airlines' knowledge of reduced quality inspection</u>.  On information and

18   belief formed after reasonable inquiry and subject to further investigation and discovery,

19   Defendant Alaska Airlines knew that Boeing and its subcontractors were relying on production

20   workers to inspect their own work, and knew that system could overlook manufacturing defects

21   that dedicated quality control inspectors would catch.

22       3.6    <u>Fuselage construction</u>.  Long before Alaska Airlines purchased the Subject Aircraft,

23   Boeing no longer conducted initial manufacture of that aircraft's fuselage, including but not

24

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

limited to the door plug assemblies, but that they were manufactured by subcontractors and delivered to Boeing in Renton, Washington, where Boeing assembled the aircraft components into an aircraft.  In December 2020, the U.S. Congress passed an FAA overhaul meant to improve oversight of Boeing and others.  In December 2021, whistleblowers gave a report to Congress warning that the aerospace industry suffered from fundamental safety oversight problems. In April 2023, Spirit AeroSystems reported defects in fittings that attach the vertical tail on MAX aircraft.[10] In August 2023, Boeing discovered defects in the aft pressure bulkhead assembled by Spirit AeroSystems.[11]  In December 2023, Boeing warned all airlines to inspect 737 MAX airliners for loose bolts in the rudder control system.[12]

3.7    Alaska Airlines' knowledge of fuselage construction.  Long before Alaska Airlines purchased the Subject Aircraft, it knew that Boeing no longer conducted initial manufacture of that aircraft's fuselage, including but not limited to the door plug assemblies, but that they were manufactured by subcontractors and delivered to Boeing in Renton, Washington, where Boeing assembled the aircraft components into an aircraft.

3.8    Incorrect and inferior parts. On information and belief formed after reasonable inquiry and subject to further investigation and discovery, incorrect and/or inferior parts were used to construct the Subject Aircraft, including but not limited the fuselage and door plug assembly.

3.9    Alaska Airlines' knowledge of incorrect and inferior parts.  On information and belief formed after reasonable inquiry and subject to further investigation and discovery, Defendant Alaska Airlines knew, or reasonably should have known, before January 5, 2024,  that

---

[10] https://www.seattletimes.com/business/boeing-aerospace/new-boeing-quality-issue-means-fewer-737-maxs-for-airlines-this-summer/
[11] https://www.seattletimes.com/business/boeing-aerospace/boeing-cfo-says-latest-737-max-defect-will-impact-deliveries-and-profits/
[12] *See, e.*g, https://www.seattletimes.com/business/boeing-aerospace/boeing-737-max-timeline-troubled-history-uncertain-future/

FIRST AMENDED COMPLAINT FOR DAMAGES - 12

incorrect and/or inferior parts were being used to construct the Subject Aircraft, including but not limited the fuselage and door plug assembly.

## IV.   <u>THE PARTIES</u>

4.1   <u>Plaintiff Iris Ruiz</u>. Plaintiff Iris Ruiz was a passenger on the January 5, 2024 Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. At that time and at the commencement of this action, she was a resident of Vancouver, Washington. She was in seat 18A.

4.2   <u>Plaintiff Garet Cunningham</u>.  Plaintiff Garet Cunningham was a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. He was in seat 28D.  At that time and at the commencement of this action, he was a resident of Corona, California.

4.3   <u>Plaintiff Rosalba Ruiz</u>. Plaintiff Rosalba Ruiz was a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. She was in seat 28E.  At that time and at the commencement of this action, she was a resident of Corona, California.

4.4   <u>Plaintiff Bart Berry</u>.  Plaintiff Bart Berry was not a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California.  He is married to Plaintiff Elena Marie Berry, a passenger on the aircraft.  At that time and at the commencement of this action, he was a resident of Venice, Florida.

4.5   <u>Plaintiff Elena Marie Berry</u>.  Plaintiff Elena Marie Berry was a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. She was in seat 18C. At that time and at the commencement of this action, she was a resident of Venice, Florida.

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1    4.6    <u>Plaintiff Gwint L. Fisher</u>.  Plaintiff Gwint L. Fisher was a passenger on

2  January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario,

3  California.  He was in seat 16C.  At that time and at the commencement of this action, he

4  was a resident of Long Beach, Washington.

5    4.7    <u>Plaintiff Renée Fisher</u>. Plaintiff Renée Fisher was a passenger on January 5,

6  2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California.  She

7  was in seat 16B.  At that time and at the commencement of this action, she was a resident

8  of Long Beach, Washington.

9    4.8    <u>Plaintiff Suzannah Anderson</u>.  Plaintiff Suzannah Anderson was a passenger

10  on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario,

11  California.  She was in seat 1C.  At that time and at the commencement of this action, she

12  was a resident of Portland, Oregon.

13    4.9    <u>Plaintiff Caden Ashkar, a minor,</u> was a passenger on January 5, 2024,

14  Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California.  He was in

15  seat 20F.  At that time and at the commencement of this action, he was a resident of

16  Temecula, California.

17    4.10    <u>Plaintiff Kendra Frome</u>.  Plaintiff Kendra Frome was a passenger on

18  January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario,

19  California. She was in seat 19D. Her 1-year-old son was in her lap. Her 3-year-old daughter

20  was in 19E. Her five-year-old daughter was in 19F. At that time and at the commencement

21  of this action, she was a resident of Redlands, California.

22    4.11    <u>Plaintiff Jacob Frome</u>. Plaintiff Jacob Frome, a 1-year-old minor, was a

23  passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to

24

FIRST AMENDED COMPLAINT FOR DAMAGES - 14

STRITMATTER KESSLER
KOEHLER MOORE
3600 15ᵗʰ Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Ontario, California.  He was in Seat 1D in his mother Kendra Frome's lap. At that time and at the commencement of this action, he was a resident of Redlands, California.

4.12    Plaintiff Hazel Frome. Plaintiff Hazel Frome, a 3-year-old minor, was a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. She was in Seat 1E. At that time and at the commencement of this action, she was a resident of Redlands, California.

4.13    Plaintiff Olivia Frome. Plaintiff Olivia Frome, a 5-year-old minor, was a passenger on January 5, 2024, Alaska Airlines Flight 1282, departing Portland, Oregon to Ontario, California. She was in Seat 1F.  At that time and at the commencement of this action, she was a resident of Redlands, California.

4.14    Defendant Boeing.  Defendant The Boeing Company ("Boeing") is a Delaware corporation with its corporate headquarters in Arlington, Virginia. Its Commercial Airplanes Division is headquartered in in Renton, Washington. One of its principal manufacturing facilities is located in Renton, Washington. Boeing's principal place of business is in Seattle, WA 98108, where it owns, operates manages and controls one of the largest aircraft manufacturing facilities in the world, located in Everett, Washington, as well as a major manufacturing plant in Renton, Washington, and other facilities in Washington.  The registered agent for Boeing is Corporation Service Company, 300 Deschutes Way SW, Suite 304, Tumwater, WA 98501.

4.15    Defendant Alaska Airlines, Inc.  Defendant Alaska Airlines, Inc. is a corporation organized and existing under the laws of the state of Washington with its headquarters in Washington, located at 19300 International Blvd, Ste 800, SeaTac, WA, 98188-4231.   Its registered agent for service of process in Washington is Kyle Levine, 19300 International Blvd.,

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Ste. 800, SeaTac, WA, 98188-4231.  Defendant Alaska Airlines' principal business is the transportation of passengers on aircraft.

## V.   JURISDICTION & VENUE

5.1   Subject matter jurisdiction.  The Superior Court of the State of Washington has jurisdiction over the subject matter and persons in this action because the incident complained of arose from Defendants and/or their agents' commission of one or more tortious acts within Washington, and/or ownership, use and/or possession of property within Washington, and the damages suffered by each Plaintiff exceeds three hundred dollars.

5.2   Personal jurisdiction.   Defendants are subject to personal jurisdiction in Washington for reasons pleaded in this complaint. Defendants were properly served with process in this action, in accordance with Washington law.

5.3   Venue.   Proper venue of this matter exists in the Superior Court of the State of Washington in and for King County because this cause of action or some part thereof arose in King County, Washington.

## VI.   AGENCY

6.1   Agency.   At all times and for all purposes material to this action, an entity doing business as Spirit AeroSystems was an agent of The Boeing Company, acting within the course and scope of Spirit AeroSystems' duties as such in constructing the fuselage for the Subject Aircraft, including but not limited to construction and/or installation of the plug door and its mounting system at issue in the fuselage.

## VII.   INJURIES & DAMAGES

7.1   Physical injury.   Some passengers experienced physical injuries as a result of their experience on the Subject Aircraft on January 5, 2024. For example:

FIRST AMENDED COMPLAINT FOR DAMAGES - 16

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1    7.1.1   <u>Iris Ruiz</u>.   The plug door blow-out jolted Iris Ruiz's head back and forth

2    causing a concussion and soft tissue injuries to her neck and back. Her ears experienced so much

3    pressure she thought her head would explode. She lost hearing and her left ear bled internally. She

4    could not breathe properly as her oxygen mask did not seem to be working. These injuries led to a

5    state of confusion, as she could not perceive well what was happening. She has cried over concern

6    that if she were to die, her adolescent daughter would have nobody to care for her.

7    7.1.2   <u>Renée Fisher.</u>  Plaintiff Renée Fisher had difficulty breathing and started

8    passing out aboard the Subject Aircraft.

9    7.1.3   <u>Gwint Fisher</u>.   Plaintiff Gwint Fisher had difficulty breathing aboard the

10   Subject Aircraft. He suffers from a seizure disorder, generally triggered by stressful situations.

11   While he had that condition before January 5, 2024, the trauma of his experience on Flight 1282

12   resulted in a seizure after he disembarked.

13   7.1.4   <u>Rosalba Ruiz</u>.  Plaintiff Rosalba Ruiz had difficulty breathing.

14   7.1.5   <u>Unknown passenger</u>.  An unknown male passenger was observed to have a

15   leg or foot injury.

16   7.1.6   <u>Suzannah Anderson</u>.  Plaintiff Suzannah Anderson saw the cockpit door fly

17   open and debris fly out. She was struck in the face by an unknown object. She suffered whiplash

18   symptoms and developed severe headaches. Her oxygen stopped working and she was forced to

19   switch masks.  Blood vessels in ears ruptured and bled for days. Her sleep was disturbed.

20   7.1.7   <u>Kendra Frome</u>.   Plaintiff Kendra Frome became dizzy and felt she was

21   losing consciousness. After putting on her oxygen mask, she struggled to tighten the belts on her

22   daughters next to her and to keep a mask on her robust one-year-old son as he screamed and

23

24

FIRST AMENDED COMPLAINT FOR DAMAGES - 17

thrashed. A few minutes later, she felt the oxygen run out and started becoming dizzy again. In the days following, she developed serious back pain and could not sleep.

7.2   <u>Emotional distress</u>.   The in-flight incident aboard the Subject Aircraft on January 5, 2024 caused Plaintiffs, and on information and belief formed after reasonable inquiry and subject to further investigation and discovery, other passengers, to suffer emotional distress, including but not limited to some or all of the following: terror, fear of death or serious injury, worry, anxiety, reaction to sudden noises, flashbacks of the incident and reluctance to fly both before and after the incident aboard Flight 1282.

7.3   <u>Physical manifestations</u>. The in-flight incident aboard the Subject Aircraft on January 5, 2024 caused Plaintiffs, and on information and belief formed after reasonable inquiry and subject to further investigation and discovery, other passengers, to suffer physical manifestations borne from the emotional distress that occurred including but not limited to some or all of the following: crying, impaired and/or abnormal breathing, seizure, and insomnia. The impacts on their willingness to fly at all and future flight experiences remain to be revealed.

7.4   <u>Other injuries and damages</u>. The in-flight incident aboard the Subject Aircraft on January 5, 2024 caused Plaintiffs, and on information and belief formed after reasonable inquiry and subject to further investigation and discovery, other passengers and their spouses and/or registered domestic partners, to suffer other special and general damages in amounts to be proved at trial, including but not limited to charges for evaluation and/or treatment of health conditions and associated travel expenses, ticket fees, costs associated with cancelation of travel plans, the value of lost personal items, lost wages and other economic opportunities damages, psychological injury, lost enjoyment of life, lost travel and economic opportunities, inconvenience, lost personal experiences, and loss of consortium.

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

VIII.   <u>CAUSES OF ACTION</u>

For causes of action based upon the foregoing allegations, Plaintiffs allege:

A.   **PRODUCT LIABILITY: CONSTRUCTION DEFECT - BOEING**

8.1   <u>Product</u>.  The Subject Aircraft and its left plug door assembly are each a "product" and a "relevant product" within the meaning of the Washington Product Liability Act, Chapter 7.72 of the Revised Code of Washington.

8.2   <u>Deviation</u>.   On information and belief, subject to further investigation and discovery, the Subject Aircraft and its left plug door assembly were each defective in their construction within the meaning of RCW 7.72.030(2)(a), because when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line, in the manners described above.

8.3   <u>Consumer expectation</u>.  On information and belief formed after reasonable inquiry and subject to further investigation and discovery, the Subject Aircraft and its left plug door assembly were each defective in their construction within the meaning of RCW 772.030(2)(a), because they were unsafe to an extent beyond that which would be contemplated by the ordinary consumer, in the manners described above.

B.   **BREACH OF COMMON CARRIER'S DUTY - ALASKA AIRLINES**

8.4   <u>Boeing's criminal history</u>. Boeing was indicted for defrauding the United States government because Boeing perpetuated a culture of concealment and fraud in connection with the FAA's evaluation of Boeing's 737 MAX airplane, dating back to 2016.  Specifically, Boeing concealed from the FAA important information about a change to the Maneuvering Characteristics Augmentation System ("MCAS"), which led the FAA to delete information about the MCAS from

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

a report, which in turn led to that information being omitted from airplane manuals and pilot training materials. On or about January 7, 2021, Boeing admitted its conspiracy to defraud the United States, and entered into a deferred prosecution agreement with the United States Government, by which it paid a fine of $2.5 billion.  "Today's deferred prosecution agreement holds Boeing and its employees accountable for their lack of candor with the FAA regarding MCAS," said Special Agent in Charge Emmerson Buie Jr. of the FBI's Chicago Field Office. Acting Assistant Attorney General David P. Burns of the Justice Department's Criminal Division stated, "The tragic crashes of Lion Air Flight 610 and Ethiopian Airlines Flight 302 exposed fraudulent and deceptive conduct by employees of one of the world's leading commercial airplane manufacturers."  Boeing's employees chose the path of profit over candor by concealing material information from the FAA concerning the operation of its 737 Max airplane and engaging in an effort to cover up their deception. This resolution holds Boeing accountable for its employees' criminal misconduct, addresses the financial impact to Boeing's airline customers, and hopefully provides some measure of compensation to the crash-victims' families and beneficiaries."  In that press release, U.S. Attorney Erin Nealy Cox for the Northern District of Texas stated, "The misleading statements, half-truths, and omissions communicated by Boeing employees to the FAA impeded the government's ability to ensure the safety of the flying public." "This case sends a clear message: The Department of Justice will hold manufacturers like Boeing accountable for defrauding regulators – especially in industries where the stakes are this high."[13]

8.5     Court finding of fraud.  On October 21, 2022, a federal judge of the United States District Court for the Northern District of Texas, after hearing evidence and testimony, found that if Boeing had not committed its fraud crime, the FAA would have required specific training for

---

[13] https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1   operators of the 737 MAX concerning differences in flight controls between that aircraft type and

2   the prior version of the 737, known as the 737 Next Generation, and would have included

3   information related to MCAS's low-speed expansion capabilities in relevant training materials.

4   Had that occurred, foreign regulators—including Indonesian and Ethiopian authorities—would

5   have issued similar training certifications and instructional materials, having taken their cue from

6   the world's leading authority on aviation standards, the FAA. And ultimately, foreign operators of

7   the 737 MAX—including the pilots on Lion Air Flight 610 and Ethiopian Airlines Flight 302—

8   would have received training adequate to respond to the MCAS activation that occurred on both

9   aircrafts. In sum, but for Boeing's criminal conspiracy to defraud the FAA, 346 people would not

10  have lost their lives in those airline disasters.[14]

11      8.6     Alaska Airlines' knowledge of Boeing's crime.   The indictment and deferred

12  prosecution agreement related to the crashes of the 737-MAX 8 aircraft involved in the Lion Air

13  Flight 610 and Ethiopian Airlines Flight 302 disasters were big news, and a major subject of

14  discussion in the commercial aviation industry. On information and belief formed after reasonable

15  inquiry, and subject to further investigation and discovery, Defendant Alaska Airlines top

16  management was keenly aware of that news as it broke.

17      8.7     Alaska Airlines' purchase of 737-MAX 9 aircraft. On October 26, 2022, Defendant

18  Alaska Airlines announced that it had made the "biggest Boeing aircraft order in its 90-years

19  history".[15] The announcement said, in part:

20          Already operating a fleet of 35 737-9 aircraft, we expect to accept delivery of
            another 43 MAX aircraft between now and the end of 2023—at which point we
21          will once again operate a mainline fleet solely of Boeing aircraft. The performance

22  _____

[14] *United States of America v. The Boeing Company*, Criminal Action No. 4:21-cr-5-O (N.D. Tex. 10/21/2022), Dkt.

23  116 (Second Memorandum Opinion & Order)
[15] https://news.alaskaair.com/alaska-airlines/alaska-airlines-makes-biggest-boeing-aircraft-order-in-its-90-year-
24  history/

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

of the 737-9 has exceeded expectations on economics and fuel efficiency, as well as guest satisfaction.

This order positions Alaska's fleet as one of the most efficient, environmentally friendly, and profitable fleets in the industry. The order includes 737-8, 737-9 and 737-10 aircraft, enabling Alaska to optimally match aircraft size and capability with market characteristics. We have full flexibility to shift between 737 MAX models as appropriate.

Two months later, Alaska Airlines announced a restructured agreement with Boeing to acquire a total of 68 737-9 MAX aircraft with options for another 52. In the announcement, Brad Tilden, CEO of Alaska Airlines, Inc.'s parent company, Alaska Air Group, stated, "We believe in this airplane, we believe in our strong partnership with Boeing, and we believe in the future of Alaska Airlines and the incredible opportunities ahead as we climb our way out of this pandemic. We could not ask for a better partner than Boeing and we are delighted to be standing side by side with them as we work together to get our economy back on its feet." The announcement went on: "With Alaska's industry-leading reputation for safety, sustainability and customer service, we are honored that the airline has chosen to invest in its future with a significant purchase of additional Boeing 737 airplanes," said Stan Deal, president and CEO, Boeing Commercial Airplanes. "We are grateful for Alaska's trust and partnership. Our team is focused on delivering their first 737 MAX jets and helping ensure a safe and seamless entry into service." The announcement declared Alaska Airlines' intention to replace all its Airbus A319 and A320 airliners with Boeing aircraft, in the interests of managing costs and liquidity, and to own the new aircraft rather than lease them. The announcement gave a nod to Boeing, including the phrase, "leveraging the talents of a global supplier base." "A small signing ceremony between Alaska and Boeing executives was held on

FIRST AMENDED COMPLAINT FOR DAMAGES - 22

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

Friday, Dec. 18, at the Boeing Delivery Center in Seattle" to seal the deal.[16] A photo from the ceremony is below:



8.8    <u>Distribution of 739-9 aircraft</u>.  On information and belief formed after reasonable inquiry and subject to further investigation and discovery, as of January 2024, there are 212 737-9 aircraft in operation globally, of which Alaska Airlines operates 65 (or 30.66%) and United Airlines 79 (or 37.26%).

8.9    <u>Common Carrier</u>.  Defendant Alaska Airlines was by law at all times material to this action a common carrier with respect to each Plaintiff.

8.10    <u>Highest Duty</u>.  Airlines and other common carriers owe their passengers the highest duty of care known to the law.

8.11    <u>Nature of Duty</u>. A common carrier has a duty to its passengers to exercise the highest degree of care consistent with the practical operation of its type of transportation and its business as a common carrier. Any failure of a common carrier to exercise such care is negligence. WPI 100.01.

---

[16] https://news.alaskaair.com/newsroom/alaska-airlines-announces-restructured-agreement-with-boeing-to-acquire-a-total-of-68-737-9-max-aircraft-with-options-for-another-52/

FIRST AMENDED COMPLAINT FOR DAMAGES - 23

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

8.12    Others' misconduct. The duty of a common carrier includes a duty to protect its passengers from harm resulting from the misconduct of others, when such conduct is known or could reasonably be foreseen and prevented by the exercise of the care required of a common carrier.

8.13    Acknowledgement of need for improvement.  On January 13, 2024, Defendant Alaska Airlines published the following obvious statement, "Last week's incident involving Alaska Airlines Flight 1282 was an extremely sobering reminder that these layers require continuous strengthening and improvement."[17]  Alaska Airlines then stated:

> Boeing leadership has publicly said that this incident is the result of a "quality escape."[18] This week, we engaged in a candid conversation with Boeing's CEO and leadership team to discuss their quality improvement plans to ensure the delivery of the highest quality aircraft off the production line for Alaska."  We welcome and appreciate the FAA's recently announced steps to audit and review all safety processes in the production of the 737-9 MAX aircraft, and more broadly at Boeing and Spirit AeroSystems, Boeing's supplier that builds the fuselage for the planes.
>
> In addition to the FAA's review and oversight, Alaska Airlines will initiate and enhance our own layers of quality control to the production of our airplanes:
>
> - Our quality and audit team began a thorough review of Boeing's production quality and control systems, including Boeing's production vendor oversight, and will partner with our maintenance team on the design of enhanced processes for our own quality control over aircraft at Boeing.
> - Starting this week, we will also enhance our own quality oversight of Alaska aircraft on the Boeing production line, expanding our team with additional experienced professionals to validate work and quality on the Boeing 737 production line.
>
> Over many decades, we have cultivated a strong partnership with Boeing. With a commitment to transparency and candor, we are dedicated to working together to uphold the utmost quality and safety of our airplanes for our employees and guests.

---

[17] https://news.alaskaair.com/alaska-airlines/operations/as-1282/
[18] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES - 24

8.14   <u>What was not said</u>.  As encouraging as those words may be, they also imply Defendant Alaska Airlines' apparent failure to do the same with respect to the Subject Aircraft before January 5, 2024.  Alaska Airlines has not stated that it had any such conversation or conducted any such quality oversight before January 5, 2024, despite its knowledge of the safety hazards growing out of Boeing's adoption of a profit-driven culture – Boeing's fraudulent misrepresentations to the FAA, rushed aircraft production, curtailment of "second eye" quality inspections, <u>incorrect and inferior parts</u>, pressures to conceal reporting of production errors – that reduced Boeing aircraft manufacturing quality. Nor has Defendant Alaska Airlines adequately explained whether the Subject Aircraft's auto-pressure "fail alarm" warnings could have indicated an air leak in the fuselage. Nor has Defendant Alaska Airlines explained to the passengers on Flight 1282 why the Subject Aircraft was deemed safe to fly over land but not over water; given that depressurization could be catastrophic over any surface.

8.15   <u>Breach:</u> Failure to require proof of dedicated quality control inspectors. On information and belief formed after reasonable inquiry and subject to further investigation and discovery, Defendant Alaska Airlines breached its duty of care to the passengers on the Subject Aircraft by purchasing the Subject Aircraft without requiring Boeing to demonstrate to the airline that the Subject Aircraft, including but not limited to its fuselage and door plug assemblies, had been constructed using dedicated quality inspectors to ensure that the parts were those specified by Boeing's design engineers, that the parts met design, material and construction specifications, and that the parts were installed correctly according to Boeing's design.

8.16   <u>Breach:</u> Failure to ground Subject Aircraft.  The NTSB has reported that when Flight 1282 took off from Portland International Airport on January 5, 2024, Defendant Alaska Airlines had deemed the Subject Aircraft unsafe to fly long distances over water, based on three

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

prior instances in which the auto pressure system "fail light" illuminated, compelling use of a backup system, and was reset; including on January 3, 2024 and on January 4, 2024.  Although at the time of filing this complaint, it is not clear whether that system malfunctioned in a way that caused the Subject Aircraft's left door plug to fail in flight, it is also unclear whether those warnings were a harbinger of a slow or intermittent pressure leak at the left door plug.  Defendant Alaska Airlines breached its duty to its passengers by failing to ground the Subject Aircraft prior to the flight that gives rise to this lawsuit.

### C.   CLASS RELIEF

8.17   <u>Breach and causation</u>.  The actions and omissions of Defendants and their agents as described above breached their duties as described above to the passengers aboard Alaska Airlines Flight 1282 on January 5, 2024, as well as to their spouses and registered domestic partners, and were a proximate cause of their injuries.

8.18   <u>The Class</u>.  Plaintiffs bring this class action pursuant to CR 23(b)(1)-(3) on behalf of the Class defined as follows: All passengers aboard Alaska Airlines Flight 1282 on January 5, 2024, who were not at that time on-duty employees of the Defendant, and their spouses and registered domestic partners.

8.19   <u>Class relief</u>.  Pursuant to CR 23(c)(4)(A), Plaintiffs bring claims on behalf of themselves and the Class to adjudicate the Defendant The Boeing Company's liabilities. The extent of each individual class member's injuries and damages may be determined and resolved otherwise.

8.20   <u>Class notice</u>.  Plaintiffs request a Class Notice advising the Class Members the Class may be entitled to injunctive relief, a monetary award for their special and general damages, and any other applicable relief the Court sees fit and just to award.

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

1      8.21    Numerosity.   The Class is believed to include approximately 171 individual

2  passengers and their spouses and registered domestic partners, at least some of whom reside in

3  Washington State, but some of whom do not.  The Class is so numerous that joinder of all members

4  is impracticable.  The disposition of the liability claims of the Class in a single action will provide

5  substantial benefits to all parties and the Court.

6      8.22    Commonality.   The Class members have questions of law and fact in common,

7  including but not limited to:

8      8.22.1  The facts, federal and state law pertaining to the cause(s) and nature of the

9  incident aboard Flight 1282 on January 5, 2024 that is the subject of this complaint; and

10     8.22.2  Whether Defendant The Boeing Company and its agents breached their

11  legal duties to the Class members as described above, and whether any or all of those breaches

12  was a proximate cause of the depressurization event described above.

13     8.23    Typicality.    Plaintiffs' liability claims and claims for injunctive relief are typical

14  of the claims available to the other members of the Class and are not subject to any atypical claims

15  or defenses.  The Class liability issues are identical to the entire Class.

16     8.24    Adequacy.   Plaintiffs will fairly and adequately represent the Class, and are

17  committed to prosecuting this action, have no conflicts of interests, and have retained competent

18  counsel who are experienced civil trial lawyers with recent significant experience in complex and

19  class action litigation and trial, including but not limited to matters involving aviation.  Plaintiffs

20  and their counsel are committed to prosecuting this action vigorously on behalf of the Class and

21  have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are

22  contrary to or that conflict with those of the proposed Class.

23

24

STRITMATTER KESSLER
KOEHLER MOORE
3600 15th Ave W, Ste. 300
Seattle, WA 98119
Tel: 206.448.1777

8.25   <u>Predominance</u>.   The common issues identified above predominate over any individualized issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

8.26   <u>Superiority</u>. Plaintiffs, Class members, and other travelers on Boeing 737-MAX 9 model aircraft have suffered and may continue to suffer harm and damages as a result of Defendants and their agents' misconduct.  Absent a Class action, most Class members would likely find litigation of their claims cost-prohibitive.

8.26.1 Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, and provides a single forum for all claims, which forum is where the defendants are at home.  On information and belief, no member of the class has commenced any litigation concerning the controversy that is the subject of this action.  If any members of the class are interested in individually controlling the prosecution of separate actions, they may opt out of the class. Whether such class members exist is presently unknown to Plaintiffs.

8.26.2  Class members can be identified by Defendants electronic search of Alaska Airlines' Flight 1832's passenger manifest.

8.26.3  There will be no significant difficulty in the management of this case as a Class action.  Once relief is granted on Class issues, the Class will be notified of the opportunity to come forward and assert individual claims for relief.  Those claims can be grouped or sorted into subclasses as needed if they do not resolve.

## IX.   <u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiffs respectfully request this Court grant them the following relief against Defendants jointly and severally:

FIRST AMENDED COMPLAINT FOR DAMAGES - 28

**A.**  Special and general damages in amounts to be proved at trial, for the personal and economic harms identified above.

**B.**  If a Defendant brings any frivolous or unfounded defenses, for attorneys' fees and costs pursuant to RCW 4.84.185 and/or Rule 11 of the Superior Court Civil Rules;

**C.**  Reasonable attorneys' fees and costs to the extent allowed by law;

**D.**  Pre- and post-judgment interest on any judgment awarded to Plaintiffs to the maximum extent allowed by law;

**E.**  Class certification;

**F.**  Class Notice of Class Member rights, to be provided to Class Members at Defendant's expense;

**G.**  Such other and further relief as this Court seems fit and just to award.


DATED this 16th day of January, 2024.


STRITMATTER KESSLER KOEHLER MOORE


By:  Daniel R. Laurence, WSBA#19697
Brad Moore, WSBA#21802
Melanie Nguyen, WSBA #51724
Furhad Sultani, WSBA#58778

Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR DAMAGES - 29